KIMBERLY THAMES

        Plaintiff,

v.

        CASE NO. 16-CV-14130
        HON. GEORGE CARAM STEEH

CITY OF WESTLAND, et al.,

        Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (Doc. 35) AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 36)**

## I. Overview

Plaintiff Kimberly Thames, a 57-year old pro-life advocate, brought

this 42 U.S.C. § 1983 suit arising out of her arrest and weekend detention

at a Westland police station holding cell, after an abortion clinic's security

guard accused her of stating, "I prophesy bombs, I prophesy bombs. There

is going to be a bombing in the near future." Thames denies making any

statement involving the word, "bombs." Thames brought suit against

Defendants the City of Westland, the Westland Chief of Police, four

Westland police officers involved in her arrest, the Northland Family

Planning Clinic, Inc. ("Northland") and its Chief Executive Officer, Renee

Chelian, its employee Mary Guilbernat, and John Doe, the clinic's security guard. By prior order of the court, Northland, Chelian, and Guilbernat have been dismissed. Now before the court is a motion for summary judgment brought by the remaining Defendants as to the federal claims, and a cross-motion for partial summary judgment as to liability brought by Thames for most of the same claims. Oral argument was heard on March 15, 2018 and informs this court's decision. Also, in rendering its decision here, the court has reviewed the audiotape of the 9-1-1 call and various video recordings of Thames' arrest.

For the reasons set forth below, summary judgment shall enter for the City of Westland and Police Chief Jedrusik because there is no basis for *Monell* or supervisory liability. However, Defendants' motion for summary judgment for the arresting Defendants on Plaintiff's Fourth Amendment wrongful arrest claim shall be denied. Also, Defendants' motion for summary judgment shall be denied as to Plaintiff's First Amendment retaliatory arrest claim and Fourteenth Amendment equal protection claim as to Defendants Officer Gatti and Sergeant Brooks, but shall be granted as to Officers Soulliere and Tardif. Plaintiff's motion for partial summary judgment as to liability shall be denied.

## II. Factual Background

On Saturday, August 27, 2016, Thames, a Roman Catholic and pro-life supporter, stood on a public sidewalk outside the Northland abortion clinic holding a rosary and a sign in defense of the unborn.  Thames was known to the Northland clinic as a frequent protestor.  At the same time, a religious sister was also peacefully protesting near Thames.  Thames engaged the security guard, Robert Parsley, standing outside the clinic in conversation and informed him that she was praying for him and hoped he could find a new position.  She alleges that he then informed her that there have been bomb threats against abortion clinics, to which she claims she responded that she was not aware of any bombings in Michigan.  After their conversation, Thames left in her car to use a nearby restroom.

Parsley's version of their conversation is quite different.  In two different accounts, he claims that Thames threatened that bombs would fall.  He reported these allegations to employees of the clinic.  One of the clinic's employees, defendant Guilbernat, placed a 9-1-1 call to the police.  In that call, Guilbernat stated, "We have protestors outside and one of them just made a statement that there's going to be a bombing."  (Doc. 35, Ex. B at 00:04:09).  The 9-1-1 operator asks her, "What exactly did they say?" *Id.* at 00:09:12, and Guilbernat repeats, "There's going to be a bombing."  *Id.*

at 00:12-14.  The operator sought a second time to clarify the threat, asking, "That's all they said is there's going to be a bombing?  That's what they said, word for word?"  *Id.* at 00:14-18.  To which Guilbernat, replied, "Yes."  *Id.* at 00:18-19.  The operator then sought a third time to clarify the threat, to which Guilbernat accused Thames of stating "there's going to be a bombing."  *Id.* at 01:57-58.

Guilbernat then gave the operator a description of the woman in question, describing her as dark complexioned, with dark hair in a bun, wearing a light blue short-sleeved top, a long blue skirt and flip-flops.  *Id.* at 00:30-33, 1:01-11.  In response to the 9-1-1 call, four Westland police officers responded to the clinic: Officers Jason Soulliere, John Gatti, Adam Tardif, and Sergeant Norman Brooks.  These officers are named Defendants.  Officer Halaas appeared later on the scene, and he has not been named in the lawsuit.

Thames returned to the location to continue protesting and saw several police vehicles and officers speaking to Parsley.  Officer Gatti arrived on the scene first and interviewed Parsley and Guilbernat.  Both identified Thames to him as the person who had made the statement.  (Doc. 36, Ex. B at 8:50:19-25, 08:51:41-2, 08:52:01-03).  Parsley told Officer Gatti that Thames stated, "I prophesy bombs are going to fall and

they're going to fall in the near future."  (Doc. 36, Ex. B at 8:51:31-8:52:53, Ex. K at 53:5-23).  Parsley also accused Thames of stating, "I prophesy bombs are going to fall and they're going to fall on you people."  (Doc. 40, Ex. E at 08:52:46-52).  But when Parsley gave his written statement to Defendant Tardif a few minutes later, his story changed and he accused Thames of stating, "bombs, bombs, on America, and bombs will blow up this building."  (Doc. 36, Ex. E, Ex. M at 18:22-25 and 19:1-3).

Officer Soulliere asked Thames if she had made a bomb threat, and she denied it.  (Doc. 36, Ex. J at 40:23-25-51:1-20; Ex. B at 8:51:21-8:15:36).  But she never specifically answered Officer Soulliere's questions about what exactly she did say to the guard, merely reiterating that she did not make a bomb threat, did not know what she had said to him that could have been misconstrued, and mentioned that he was the one who brought up alleged bombings at abortion clinics.  *Id.* at 08:51:41-2, 08:51:43-08:52:31; Doc 36-3, 57:24-25 to 58:1-17.  She also relayed her conversation with Parsley in which he told her about bombings for which she responded she was unaware of that activity.  (Doc. 36, Ex. J at 57:24-25-58:1-17, Ex. B at 8:53:47-8:55:07; Ex. I at 42:18-25; 51:1-4; Ex. 1 at ¶18).

The senior officer on the scene, Sergeant Brooks, ordered Thames'
arrest for making a terrorist threat. (Doc. 35, Ex. C at 30). Specifically, she
was arrested for violating Michigan's anti-terrorism statute, Mich. Comp.
Laws § 750.543m. Thames has not challenged the constitutionality of the
statute. Officer Soulliere then handcuffed Thames. (Doc. 35, Ex. D at 30).
After her arrest, Thames pleaded with the religious sister to come to her
aid. (Doc. 36, Ex. J at 68:14-15). The religious sister told Officer Soulliere
that she did not hear Thames make a bomb threat, implored him to
question Thames and Parsley together so he could determine who was
lying, and insisted that the ones that should be arrested were the clinic's
owner and staff who were the ones "killing God's children." (Doc. 36, Ex. J
at 69:12-71:22). Officer Gatti told the religious sister that she was a
"disgrace." (Doc. 36, Ex. K at 19:23-25-20:1-5). The officers did not take a
written statement from the sister or from two other persons who were
outside the clinic when the alleged threat was made. (Doc. 36, Ex. J at
59:13-25-60:1-13; Ex. L at 23:24-25 – 24:1-5).

After Thames' arrest, she was placed in the back of Officer Halaas'
patrol vehicle, but when he was called away to respond to another incident,
she was moved to Officer Soulliere's patrol vehicle. (Doc. 35, Ex. E at
08:57:35-09:01:49; Ex. F at 75-5). At the time she was placed in Officer

Halaas' vehicle, Thames told him, "You got the wrong person," to which he replied, "Ma'am, I don't give a shit!  I got to go!"  (Doc. 36, Ex. O at 46:18-25 to 47:1-10).  After her arrest, Officers Soulliere and Halaas searched her vehicle, but did not find any explosives or any other contraband.  (Doc. 35, Ex. E at 08:57:36-09:02:50; Ex. F at 72-3.)  The officers did not search the clinic, the adjacent parking lot, or nearby dumpster, nor did they use any bomb sniffing dogs.  In fact, the Westland police department does not have any bomb sniffing dogs, but would have to call the state police for such a search.  The officers did not impound Thames' vehicle.

Officers Gatti and Soulliere testified at their depositions that the City of Westland did not train them to distinguish between true threats and protected speech.  (Doc. 36, Ex. J at 36:16-19, Ex. K at 117:4-7).  Sergeant Brooks testified:

> I don't know the exact verbiage that — that he said to Officer Gatti.  My — there's only one word that concerns me in this whole thing and that's bombs.  Just like you can't yell fire in a crowded theater, you can't say anything about bombs near a facility that performs abortions.

(Doc. 36, Ex. at 29:20-25).  At his deposition, Sergeant Brooks was asked why the officers did not search the surrounding vicinity of the abortion clinic for a bomb, and he responded:

> At that — at that point we were not concerned about a bomb being physically there at that particular time because

of the amount of protesters and employees and patients of the clinic.  The reason we were sent there was because of the threat.

(Doc. 36, Ex. L at 28:9-13).  Sergeant Brooks was then asked, if the threat was credible, why did they not evacuate the clinic, and he responded, the "threat doesn't have to be credible according to the law."  *Id.* at 16-17.  In addition, at the scene of the arrest, Sergeant Brooks also said, "Anybody who has anything to do with this whole thing, [they're] fanatics."  (Doc. 36, Ex. C at PgID 597).

Soulliere drove Thames to the Westland police station, booked and placed her in a holding cell where she remained over the weekend.  (Doc. 36, Ex. O at 63:1-10).  She was released Monday morning at 10:14 a.m. Thus, she was in police custody for a little over 49 hours.  Thames did not eat or sleep during that time, although she was offered food.  (Doc. 36, Ex. 1 at ¶¶ 25-40).  The holding cell had a cement slab for sleeping and a toilet which was visible to all.  (Doc. 36, Ex. 1 at ¶¶ 25-40, Ex. G).

Officer Soulliere's report regarding Thames' arrest would not have come to the attention of the on-call detective that weekend, Detective Jerry Farrar, until Sunday because the report was not approved by a sergeant until after Detective Farrar's shift ended on Saturday.  (Doc. 45, Ex. J at 18-21).  Detective Farrar was handling a homicide investigation which began

on Sunday morning, and thus, was not able to address Thames' case until Monday morning.  (Doc. 45, Ex. I at 65:22-25-66:1-13; Ex. J at 19-21, 22-28, 39).  Thames was unable to attend Mass on Sunday or receive the Eucharist.  (Doc. 36, Ex. 1 at ¶ 34).  Upon reviewing the case, Detective Farrar made the decision to release Thames finding that "though there was probable cause to arrest Kimberley, I find at this time there is insufficient evidence to charge her with a crime."  (Doc. 45, Ex. J at 27:8-12).

Detective Farrar did not talk to the prosecutor before making his decision.  *Id.* at 25:9-12.  In his incident report, Detective Farrar wrote that he read Robert's written statement accusing Thames of stating "bombs, bombs, bombs on America.  And bombs will blow up this building," and determined that "I do not see a direct threat where Kimberly threatened to bomb the clinic."  (Doc. 36-3 at PgID 611).  After her release, the police denied Thames' request that they take her to her car so she walked about a mile to her vehicle.  (Doc. 36, Ex. 1 at ¶ 44).

After Thames' release, the City police department conducted an internal investigation, and concluded that Thames' arrest was reasonable and justified and was consistent with its policies, practices, and procedures.  (Doc. 36, Ex. O at 49:5-10, 91:5-22, Ex. C).  However, Officer Gatti received a verbal reprimand for telling the religious sister that she was a

disgrace. (Doc. 36, Ex. O at 47:17-48:2). The Chief of Police, Jeff Jedrusik, reviewed the report of the internal investigation and accepted its findings. (Doc. 36, Ex. O at 44:6-25-45:1-3). Deputy Chief Brian Miller, the witness designated by the City pursuant to Federal Rule of Civil Procedure 30(b)(6), testified Thames' arrest and detention were consistent with the policies and practices of the police department. (Doc. 36, Ex. O at 86:1-10). However, Officers Gatti and Sergeant Brooks were cautioned to refrain from "[e]ngaging in political or religious/morality discussions with bystanders." (Doc. 36, Ex. C at 18).

Thames filed this 42 U.S.C. § 1983 lawsuit against the City of Westland; Police Chief Jeff Jedrusik; Officers Soulliere, Gatti, Tardif, and Brooks; Northland, Northland's CEO Chelian, Northland's employee Guilbernat, and John Doe, Northland's security guard. Northland, Chelian, and Guilbernat have been dismissed by prior order of the court. Thames' Complaint alleges violations of her Fourth, First, and Fourteenth Amendment rights and two related state law claims.

### III. Standard of Law

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## IV. Analysis

### A.    Arresting Officers

#### 1. Qualified Immunity

Defendant officers argue qualified immunity shields them from liability under § 1983. Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.'" *Stanton v. Sims*, 571 U.S. 3, 4–5 (2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  It protects all officers except "the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation and internal quotation marks omitted).  As the Supreme Court has explained, "[t]his accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Id.* (citation omitted).  Indeed, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments. . . ." *Stanton*, 571 U.S. at 5 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation marks omitted)).

The court employs a two-step inquiry in deciding qualified immunity questions.  *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015).  "'First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?  These prongs need not be considered sequentially.'" *Id.* (internal quotations marks and citation omitted).  Where there is no showing of a constitutional violation, the officer is cloaked with qualified immunity and the court need not address the

second prong. *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (citing *Pearson*, 555 U.S. at 232).

The court first considers the question of qualified immunity as to the four responding officers. Thames alleges five constitutional violations: (1) wrongful arrest in violation of the Fourth Amendment (2) retaliatory arrest in violation of the First Amendment, (3) violation of free exercise of religion in violation of the First Amendment, (4) violation of the Equal Protection Clause of the Fourteenth Amendment, and (5) conspiracy to violate constitutional rights. The court considers each alleged violation below.

### 2. Wrongful Arrest Claim under the Fourth Amendment

The court first considers whether the officers had probable cause to arrest Thames. If so, Defendant Officers are entitled to summary judgment on Thames' Fourth Amendment wrongful arrest claim. "Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012) (internal quotation marks and citation omitted). The Sixth Circuit has defined probable cause as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *Id.* (internal quotation marks and citation

omitted).  "The inquiry is an objective one; the existence of probable cause depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest regardless of the arresting officer's subjective state of mind."  *Id.* at 500 n. 52 (internal quotations marks and citations omitted).  "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (quoting *Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir. 1995)).

Having set forth the standard of law for determining probable cause, the court turns now to the specific facts of this case to determine whether probable cause existed for the arrest.  For the reasons set forth below, an issue of fact exists as to whether the officers had probable cause to arrest Thames which precludes the entry of summary judgment for the arresting officers.  The security guard accused Thames of making the following statement before her arrest: "*I prophesy bombs are going to fall and they're going to fall in the near future."*  After her arrest, he reported she said, "*bombs, bombs, on America, and bombs will blow up this building.*"  The fact that the security guard arguably changed his story may call into question his credibility.  Also, the religious sister present at the scene

denied that Thames had made the statement. Thus, a reasonably prudent officer on the scene might doubt the security guard's story. Whether or not the security guard provided reasonably trustworthy information is a question of fact for the jury.

Nevertheless, assuming that a reasonably prudent officer would accept the security guard's version of events as true, the court considers whether these two statements give rise to probable cause for her arrest. Thames was arrested for violating Mich. Comp. Laws § 750.543m which provides in pertinent part:

> (1) A person is guilty of making a terrorist threat or of making a false report of terrorism if the person does either of the following:
>
> (a) Threatens to commit an act of terrorism and communicates the threat to any other person.
>
> (b) Knowingly makes a false report of an act of terrorism and communicates the false report to any other person, knowing the report is false.
>
> (2) It is not a defense to a prosecution under this section that the defendant did not have the intent or capability of committing the act of terrorism.

Mich. Comp. Laws § 750.543m(1)(a) criminalizes the "making [of] a terrorist threat" by threatening to "commit an act of terrorism" and the communication of that "threat to any other person." An "act of terrorism" is defined as a "willful and deliberate act" that would comprise a "violent

felony," known to be "dangerous to human life," and that "is intended to

intimidate or coerce a civilian population or influence or affect the conduct

of government ... through intimidation or coercion." Mich. Comp. Laws §

750.543b(a). The Michigan Court of Appeals has held that:

> Given the plain and ordinary meaning of these terms, we
> are satisfied that the statutory provisions, when read
> together, prohibit only "true threats," as they encompass
> the communication of a serious expression of an intent to
> commit an act of unlawful violence to a particular individual
> or group of individuals.... Further, because the statutes
> require the existence of an intent to "intimidate or coerce,"
> they extend beyond the type of speech or expressive
> conduct that is afforded protection by the First Amendment.

*People v. Osantowski,* 274 Mich.App 593, 603; *rev'd in part on other*

*grounds*, 481 Mich. 103 (2008); *see also People v. Bally*, No. 320838, 2015

WL 4169244, at *2–3 (Mich. Ct. App. July 9, 2015).

The Supreme Court also has addressed what distinguishes "true

threats" from political hyperbole which is constitutionally protected speech.

In *Watts v. United States*, a student at a public rally declared, "[a]nd now I

have already received my draft classification as 1-A and I have got to report

for my physical this Monday coming. I am not going. If they ever make me

carry a rifle the first man I want to get in my sights is L.B.J."  394 U.S. 705,

706 (1969).  The Court held that the student was wrongfully convicted for

allegedly threatening the President, because only a contextually credible

threat to kill, injure, or kidnap the President constitutes a "true threat" punishable under the law. *Id.* at 708. Similarly, in *Virginia v. Black*, 538 U.S. 343 (2003), the Court struck down a statute banning cross-burning with the intent to intimidate, where a provision of the law, as interpreted by the State's model jury instructions, provided that burning of a cross in public view "shall be prima facie evidence of an intent to intimidate." *Id.* at 363-64. The Court held that the prima facie evidence provision of the cross-burning ban was unconstitutional under the First Amendment, because it effectively prohibited all cross-burning regardless of whether that conduct was intended to intimidate or merely constituted protected expression. *Id.* at 367. The Court explained that "[t]rue threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359.

Based on the above discussed Supreme Court precedent, and because Michigan law is clear that Mich. Comp. Laws § 750.543m only criminalizes "true threats" which involve a "serious expression of an intent to commit an act of unlawful violence," the court considers whether the statements allegedly attributable to Thames meet this threshold. First, the court considers her pre-arrest statement, "*I prophesy bombs are going to*

*fall and they're going to fall in the near future.*"  In considering this statement, the court gives the term "prophesy" its ordinary meaning.  According to Merriam-Webster, prophesy means, "to utter by or as if by divine inspiration," "to predict with assurance or on the basis of mystic knowledge," or to "prefigure."  An example of the word in its ordinary usage is Mark Twain's text in *A Connecticut Yankee*, "every time he *prophesied* fair weather it rained."  In essence, to "prophesy" means to prognosticate, but it does not suggest willful conduct or that the speaker will be responsible for carrying out the prediction.  In the vague context allegedly used by Thames, at least a jury question exists as to whether it amounts to a true threat.

The evidence suggests that Defendant Officers did not consider the statement to be a true threat as they did not direct evacuation of the clinic, did not request the assistance of a bomb squad, did not request the assistance of a bomb sniffing dog, did not search the clinic for a bomb, did not search the surrounding area for a bomb, did not search the adjacent parking lot for a bomb, did not search the dumpster for a bomb, and did not impound Thames' vehicle for fear that a bomb might be planted in it.

The security guard did not make his written statement until after Thames was arrested.  Even so, the court considers whether that

statement amounts to a "true threat" which would give rise to probable cause for arrest. That statement was, "*bombs, bombs, on America, and bombs will blow up this building*." This statement presents a closer question than the first, but like the *"prophesy"* statement, it is a vague prediction about the future and does not suggest any present intention on the part of Thames to carry out a crime of violence against the clinic. Once again, the officers' failure to make any attempt to locate a bomb or vacate the clinic or surrounding vicinity suggests that an objectively reasonable officer on the scene might not view the statement as a true threat.

Having found that a jury question exists as to whether the security guard's allegations against Thames gave probable cause for her arrest, the court next considers whether the arresting officers are still entitled to qualified immunity. "[U]nder § 1983, an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Everson v. Leis,* 556 F.3d 484, 499 (6th Cir. 2009) (citations omitted). "[E]ven if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed

that the arrest was lawful." *Kennedy v. City of Villa Hills, Ky.,* 635 F.3d 210, 214 (6th Cir. 2011).

Viewing the facts in the light most favorable to Thames, a jury question exists as to whether a reasonable officer on the scene could have believed that her arrest was lawful. Also, all four of the arresting officers are potentially liable for the arrest. Sergeant Brooks ordered the arrest. Officer Gatti investigated the complaint at the scene. Officer Soulliere questioned Thames, placed her in handcuffs, searched her vehicle, transported her to the police station and initiated her booking. Officer Tardif took the security guard's written statement. Under Sixth Circuit precedent, those police officers present at the scene of a wrongful arrest who have the opportunity and means to prevent the harm from occurring, may be liable under § 1983 for failing to intervene to prevent the wrongful arrest. *See Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006); *Jacobs v. Village of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001). Based on the foregoing discussion, Defendant officers are not entitled to summary judgment on the wrongful arrest claim. A jury question remains as to whether there was probable cause for the arrest.

### 3. Retaliatory Arrest Pursuant to the First Amendment

Because Thames groups her First Amendment violations of freedom

of speech and the right to free exercise of her religion together in her motion for partial summary judgment, the court likewise does so. As the Sixth Circuit has observed, "[f]ree exercise claims are often considered in tandem with free speech claims and may rely entirely on the same set of facts." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 256 (6th Cir. 2015). First, the court considers whether Thames has raised a genuine issue of material fact that Officers Soulliere, Gatti, Tardif, and Brooks violated her right to freedom of speech and free exercise of religion. Thames alleges that she was engaging in protected speech when she protested outside an abortion clinic based on her sincerely held religious beliefs.

Unlike wrongful arrest claims brought under the Fourth Amendment, motive is relevant to Thames' claim that Defendant officers arrested her in retaliation for her exercise of her First Amendment rights. The Sixth Circuit has identified three elements that a plaintiff must prove to establish a retaliatory arrest claim: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *City of Villa Hills*, 635 F.3d at 217.

An issue of law exists as to whether Thames must also prove a fourth

element — that there was an absence of probable cause for her arrest — in

order to prevail on her retaliatory arrest claim under the First Amendment.

Although not identified by the parties, the issue is now before the Supreme

Court. *Lozman v. City of Riveria Beach*, 681 F. App'x 746, *cert. granted*,

138 S. Ct. 447 (2017). Circuit courts are split on this question with the

majority holding that the existence of probable cause bars a First

Amendment retaliation claim. *See Peggy v. Herrnberger*, 845 F.3d 112,

119 (4th Cir. 2017) (existence of probable cause bars First Amendment

retaliation claim); *Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002)

(same); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (same); *but

see Ford v. City of Yakima*, 706 F.3d 1188, 1196 (9th Cir. 2013) (an arrest

motivated by retaliatory animus is unlawful even if supported by probable

cause).

The Sixth Circuit has "defer[red resolution" of the question of whether

the absence of probable cause is an element of an ordinary retaliatory

arrest claim. *City of Villa Hills*, 635 F.3d at 217, n.4.[1] The Supreme Court

has ruled that probable cause is an element of a retaliatory prosecution

---

[1] *But see Barnes v. Wright*, 449 F.3d 709, 717-20 (6th Cir. 2006) (requiring absence of probable cause as an element of retaliatory arrest claim where arresting agents initiated grand jury proceedings and only arrested the plaintiff after the grand jury had indicted him.)

claim, *Hartman v. Moore*, 547 U.S. 250 (2006), but has not yet ruled on whether the reasoning of *Hartman* extends to retaliatory arrest claims. The Court addressed the issue of whether *Hartman* extends to retaliatory arrest claims in *Reichle v. Howards*, 566 U.S. 658 (2012) and noted critical differences between the two constitutional torts, as the former involves decision-making by prosecutors who are entitled to absolute immunity, and the prosecutor's alleged animus is attenuated because in the ordinary case the key defendant is not the prosecutor who made the charging decision, while the latter typically involves only the arresting officer who bears the alleged animus. *Id.* at 667-69. While observing differences in rationale which might justify treating retaliatory arrest claims differently than retaliatory prosecution claims, the Court did not reach the issue because it found that the arresting officers were entitled to qualified immunity because at the time the defendant was arrested "it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation." *Id.* at 670.

Having already determined that there is a jury question as to whether the Defendant officers had probable cause to arrest Thames, the court must consider the remaining elements of a retaliatory arrest claim to determine if the Defendant officers are entitled to summary judgment.

The first two elements are easily established.  First, Thames engaged in conduct protected by the First Amendment.  *Connick v. Myers*, 461 U.S. 138, 145 (1983) ("speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (citations omitted); *Capitol Square Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression.") (citations omitted).  Thames was protesting on a public sidewalk which the Supreme Court has recognized as "traditional public fora."  *Frisby v. Schultz*, 487 U.S. 474, 480-81 (1988).  There is no exception for public sidewalks adjacent to abortion clinics.  *McDullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014).  Second, her arrest and 49-hour detention in a holding cell would deter a person of ordinary firmness from continuing to engage in that conduct.

The only question then is whether there is a causal connection between her pro-life activities and her arrest—that is, whether her arrest was motivated at least in part by her protected conduct.  In support of her claim that the Defendant officers had retaliatory animus, Thames relies on the following evidence: (1) Sergeant Brooks who ordered the arrest, testified that "you can't say anything about bombs near a facility that

performs abortions," (Doc. 36. Ex. L at 29:20-25); (2) Defendant Brooks referred to people who protest on behalf of the unborn as "fanatics," (Doc. 36, Ex. C at 10) (3) Defendant Gatti told the religious sister who was protesting alongside Thames that "You should not be in the position you are in, you're a disgrace, (Doc. 36, Ex. K at 19:23-25 to 20:1-5) and (4) Defendant Gatti testified, "the comments that were made by her, it's a very politically religiously charged issue." (Doc. 36, Ex. K at 34:11-12, 35:18-22). Also, the court considers the fact that the arresting officers did not evacuate the clinic or make any serious efforts to locate a bomb. Based on this evidence of animus against pro-lifers, Thames has raised a genuine issue of material fact in support of her First Amendment retaliatory arrest claim. As previously discussed, the right to be free from retaliation for expressive religious activity is clearly established; thus, Officer Gatti and Sergeant Brooks are not entitled to qualified immunity on Thames' First Amendment retaliatory arrest claim. Because there is no evidence of retaliatory animus on the part of Defendant Officers Tardif and Soulliere; however, they are entitled to summary judgment on the retaliatory arrest claim.

Thames argues that the Sixth Circuit's *en banc* decision in *Bible Believers* supports her First Amendment claim. In that case, Bible

Believers had been proselytizing their religious message peacefully at an international Arab festival, but nevertheless, their signs and banners had led to a violent reaction from a group of adolescents at the festival who began hurling water bottles and other objects at them. 805 F.3d at 239-40. As a result, the police officers threatened to arrest the Bible Believers for disorderly conduct, if they refused to leave the festival. 805 F.3d at 256. The Sixth Circuit found the officer's threats to arrest the demonstrators violated the First Amendment. *Id.* at 256. Thames argues, in this case Defendant Officers acted more egregiously, as they did not merely threaten to arrest her, but actually did so. *Bible Believers* supports Thames' theory of liability because there is a question of fact as to whether Defendant officers lacked probable cause to arrest her.

Because there is a genuine issue of material fact as to whether Officer Gatti and Sergeant Brooks violated Thames' First Amendment rights, the next question is whether that right was clearly established at the time of the alleged injury. The Sixth Circuit has stated that "[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). The Sixth Circuit has emphasized the Supreme Court's admonition that the

"'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Stamm v. Miller*, 657 F. App'x 492, 496 (6th Cir. 2016) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The specific action in question need not have been previously held to be unlawful, but the unlawfulness of the act must be apparent in light of pre-existing law. *Id.* Under *Bible Believers*, and Supreme Court precedent previously discussed, the law is clearly established that the police cannot arrest a person because of their objectionable protected free speech activity; thus, the arresting officers are not entitled to qualified immunity on Thames' retaliatory arrest claim brought under the First Amendment.

Lastly, the court considers Thames' claim that Defendant Officers violated her right to the free exercise of her religion because her weekend detention in the holding cell prevented her from attending Mass and receiving the Eucharist. This is not a separate constitutional tort, but relates to damages for her wrongful arrest and retaliatory arrest claims.[2]

---

[22] For a lawful incarceration, a free exercise of religion claim requires than an inmate show that a condition of incarceration places a "substantial burden on the observation of a central religious belief or practice," *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *Living Water of Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007), *Barhite v. Caruso*, 377 F. App'x 508, 510 (6th Cir. 2010), and missing one religious service does not constitute a "substantial burden" on an inmate's right to the free exercise of her religion. *Gill v. DeFrank*, 8 F. App'x 35, 37 (2d Cir. 2001).

**4.     Equal Protection Claim under the Fourteenth Amendment**

Thames also seeks to recover for alleged violations of the Equal Protection Clause of the Fourteenth Amendment.  The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal citations omitted).   Because the freedom of speech is a fundamental right, Defendants' conduct is subject to strict scrutiny review.  *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. 2012).

The Sixth Circuit has held that "[f]undamentally, the Clause protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights."  *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).  In order to prevail on her equal protection claim, Thames must prove intentional discrimination on the basis of her protected speech.  *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987).

Unlike a Fourth Amendment wrongful arrest claim which does not allow consideration of an officer's subjective intent but is governed solely by the objective inquiry of whether or not probable cause existed, an equal protection claim considers whether an officer had discriminatory motivations. *Farm Labor Org. Comm. V. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002).

Here, Thames seeks to prove her equal protection claim on the basis that Defendant Officers allegedly singled her out for arrest because she was engaging in pro-life speech activity. In support of this claim, she relies primarily on the same evidence summarized above in support of her retaliatory arrest claim, namely (1) Officer Gatti's testimony that the arrest was justified because of the "very politically, religiously charged" issue of abortion and that the "threats that she made have been carried out in the past," (Doc. 36, Ex. K at 34:11-18), (2) Officer Gatti called the religious sister a "disgrace," (Doc. K at 19:23-25 to 20:1-5), (3) Sergeant Brooks' statement that those involved in the abortion debate are "fanatics," (Doc. 36, Ex. C at 10); (4) the Internal Investigation report statement that, "[f]amily planning centers across the country and across the world operate on a consistent heightened state of security. This is common knowledge amongst law enforcement agencies across the country and, based on this

violent history, has lent itself to be a contributing factor when establishing enforcement actions in and around family planning centers," (Doc. 36, Ex. C at 15), and (5) Defendant Officers relied solely on the security guard's statements which were not credible because his statements varied.

Based on this record, there is a genuine issue of material fact as to whether Officers Gatti and Sergeant Brooks arrested Thames for her pro-life activity, and not because she made a "true threat." Significantly, Defendants failed to evacuate the abortion clinic or make any meaningful attempt to locate a bomb. As there is no evidence of discriminatory animus on the part of Tardif and Soulliere; however, they are entitled to summary judgment on Thames' equal protection claim.

Having found a question of fact exists as to whether Officer Gatti and Sergeant Brooks violated Thames' equal protection rights, the next question is whether a constitutional right was clearly established. If not, as described above, Defendant Officers are entitled to qualified immunity. Just as with Thames' First Amendment retaliatory arrest claim, the law was clearly established that the police could not arrest a peaceful speaker engaged in protected speech on a public sidewalk. *See Bible Believers*, 805 F.3d at 258-60. Accordingly, the arresting officers are not entitled to qualified immunity on Thames' equal protection claim.

### 5. Conspiracy Count

Count five of the Complaint alleges that the Westland Defendants conspired with the Northland Defendants to violate Thames' First, Fourth, and Fourteenth Amendment rights pursuant to § 1983. Defendants seek summary judgment on this claim. Thames has not responded to the argument in her response brief, nor addressed the issue in her own motion for partial summary judgment. It appears that Thames has abandoned the claim. Even if not, there are no genuine issues of material fact as to Thames' conspiracy claim, and Defendants are entitled to summary judgment on this claim.

### B. Municipal Liability

The court next considers whether the City of Westland may be liable for alleged violations of Thames' Fourth, First, and Fourteenth Amendment rights. Municipalities are not entitled to qualified immunity, and thus, the City of Westland may be liable for alleged violations of Thames' Fourth, First, and Fourteenth Amendment rights if Thames can prove liability under *Monell.* Thames argues that that the arresting officers lacked probable cause to arrest her, and that the City's failure to train the officers on what constitutes a "true threat" was the motivating force behind the arrest, or that the City was liable because the Chief of Police ratified the conduct by

approving an investigation of the incident which concluded that the arrest was reasonable and justified.  Thames' municipal liability claim fails under either theory.

"To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's constitutional rights." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 573 (6th Cir. 2016) (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)). Systematically failing to adequately train police officers can constitute a custom or policy that leads to municipal liability. *Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir. 2010).

However, "[t]he inadequacy of police training only serves as a basis for § 1983 liability 'where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact.'" *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Most importantly, "'[t]o establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Brown*, 844 F.3d at 573 (quoting

*Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).  To succeed on a failure-to-train claim, a plaintiff must prove the following: (1) the training was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Harris*, 489 U.S. at 387)).

The standard for finding a municipality liable essentially amounts to the judicial determination that "the city itself [decided] to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011). "'A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train,' although there are rare circumstances in which 'the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Id.* (quoting *Connick*, 563 U.S. at 62, 64 (internal quotation marks omitted)). The Supreme Court has held that for police officers, it does not:

> suffice to prove that an injury or accident could have been
> avoided if an officer had had better or more training, sufficient
> to equip him to avoid the particular injury-causing conduct.
> Such a claim could be made about almost any encounter

resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

*Harris*, 489 U.S. at 391.

Thames argues that the City of Westland may be liable for her alleged constitutional deprivations because the City failed to train officers to distinguish "true threats" from political hyperbole, and ratified and sanctioned the arresting officers' alleged misconduct. Under the above precedent, the City of Westland cannot be liable under the failure to train theory of liability because Thames has not shown any pattern of alleged similar constitutional violations, or that this case is the rare case where the failure to train is so obvious that liability should be imposed even in the absence of such a history.

As to her claim that the City ratified the allegedly unlawful arrest and detention because the Chief of Police accepted an investigation finding that the arresting officers acted reasonably and in compliance with department policy, a similar argument was recently rejected by the Sixth Circuit in *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013). In that case, the plaintiff sued the Greene County Board of Commissioners on the theory, among others, that the municipality could be liable based on allegations of excessive force on the part of its deputy sheriffs where the Sheriff had

approved an investigation which exonerated his subordinate officers' use of force. *Id.* at 479. The Sixth Circuit rejected this theory of liability, stressing that *respondeat superior* liability is not available under *Monell*, and holding that the sheriff's "after-the-fact approval of the investigation, which did not itself continue cause or continue a harm against [plaintiff], was insufficient to establish the *Monell* claim." *Id.*

The Sixth Circuit explained that in order to establish *Monell* liability under a single-act theory, the plaintiff must prove that a "deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Id.* (*quoting Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (6th Cir. 1986)). And furthermore, the course of action must be the "moving force" behind the plaintiff's harm, as for example where the final decision maker directed the destruction of material evidence or ordered the takedown in question. *Id.* Here, even if the arresting officers lacked probable cause to arrest Thames, Thames has not introduced any evidence to suggest that the Police Chief's alleged approval of the investigation of the officers was the moving force behind her alleged constitutional violations. Accordingly, the City of Westland is not liable under *Monell.*

## C.    Supervisory Liability

Thames argues that Chief Jedrusik is liable as he ratified and sanctioned the alleged police misconduct and failed to adequately train and supervise these officers with regard to distinguishing between a "true threat" and protected speech.  The doctrine of *respondeat superior* does not apply, however, in § 1983 lawsuits to impute liability onto supervisory personnel. *Turner v. City of Taylor,* 412 F.3d 629, 643 (6th Cir. 2005). To plausibly find supervisory personnel liable, the Sixth Circuit has explained the standard as follows:

> [T]he § 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Id.* at 643 (internal citations omitted).  In *Turner*, plaintiff sought to hold the police Commander responsible for excessive force and other constitutional violations, arising from plaintiff's alleged beatings and mistreatment in prison, under the theory of supervisory liability because the Commander investigated plaintiff's complaints and concluded there was no evidence to support his claims.  *Id.* at 635.  The Sixth Circuit ruled this was an

inadequate basis for imposing supervisory liability because allegations that the Commander conducted an inadequate investigation and reached the wrong conclusion does not amount to a constitutional tort but merely sounds in negligence. *Id.* at 649; *see also Heyerman v. County of Calhoun,* 680 F.3d 642, 647 (6th Cir. 2012). The acts of one's subordinates or the mere failure to act standing alone are not enough to hold a supervisor liable. *Summers v. Leis,* 368 F.3d 881, 888 (6th Cir. 2004). Also, Thames' efforts to recover against Chief Jedrusik on the basis that he failed to properly train his subordinates is not actionable under § 1983 under the circumstances presented here. The Sixth Circuit has held that "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006) (internal citations omitted).

**D. John Doe Defendant**

In her Complaint, Thames names as a John Doe defendant, the security guard who alleges she made the bomb threat. Although the officer's name is now known, and Thames refers to the officer by his name in her motion for partial summary judgment, Thames never sought to

amend her Complaint to add him as a party, and failed to serve him as required under Federal Rule of Civil Procedure 4(m). The Sixth Circuit has held that a civil action against a Doe defendant never commences where they were not identified by their real names or served with process. *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) (citing *Bufalino v. Michigan Bell Tel. Co.*, 404 F.2d 1023, 1028 (6th Cir. 1968)). Until a plaintiff amends her complaint to identify a John Doe defendant by his true name, "the John Doe allegations in the complaint are mere surplusage." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *5 (E.D. Tenn. Nov. 4, 2009) (collecting cases). Accordingly, the John Doe defendant shall be DISMISSED.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (Doc. 35) is GRANTED IN PART and DENIED IN PART as set forth below:

IT IS ORDERED that Defendants' motion for summary judgment on Plaintiff's wrongful arrest claim (count three) is DENIED as to the arresting officers, Defendants Soulliere, Gatti, Tardif, and Brooks.

IT IS FURTHER ORDERED that summary judgment is DENIED as to Plaintiff's retaliatory arrest claim in violation of the First Amendment (counts

one and two) as to Defendants Officer Gatti and Sergeant Brooks as genuine issues of material fact exist as to whether Thames' constitutional rights to engage in protected speech and to the free exercise of her religious beliefs were violated. However, summary judgment is GRANTED as to Defendant Officers Soulliere and Tardif on Plaintiff's retaliatory arrest claim (counts one and two) as there is no evidence of animus on the basis of Plaintiff's pro-life advocacy.

IT IS FURTHER ORDERED that summary judgment is DENIED as to Plaintiff's allegation that Defendant Officer Gatti and Sergeant Brooks denied her equal protection in violation of the Fourteenth Amendment (count four) because genuine issues of material fact exist as to whether these Defendants arrested her based on her pro-life advocacy. However, because there is no evidence of discriminatory animus on the part of Defendant Officers Soulliere or Tardif, summary judgment is GRANTED as to these officers on the equal protection claim (count four).

IT IS FURTHER ORDERED that Defendants' motion for summary judgment as to Plaintiff's conspiracy claim (count five) is GRANTED.

IT IS FURTHER ORDERED that that summary judgment is GRANTED as to all claims against Police Chief Jeff Jedrusik as there is no basis for supervisory liability.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment is GRANTED as to all claims against the City of Westland as there is no basis for *Monell* liability.

IT IS FURTHER ORDERED that Plaintiff's motion for partial summary judgment (Doc. 36) as to liability only is DENIED.

IT IS FURTHER ORDERED that John Doe is DISMISSED.

**IT IS SO ORDERED.**

Dated:  April 20, 2018

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 20, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk